UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERIC C. BERGER, et al. | CIVIL ACTION |
| VERSUS | NO: 22-04289 |
| AIG PROPERTY CASUALTY INSURANCE AGENCY, INC., et al. | SECTION: T (2) |

## ORDER AND REASONS

Before the Court are a Motion for Summary Judgment (R. Doc. 45) and a Motion for Partial Summary Judgment (R. Doc. 48) filed by Lexington Insurance Company. Plaintiffs Eric C. Berger and Mona H. Berger have filed responses (R. Docs. 50 and 51).[1] Defendant has filed replies in support of its Motions. R. Docs. 58 and 57. For the reasons set forth below, the Court will grant both motions.

**BACKGROUND**

The underlying facts in this insurance coverage case are not genuinely disputed. On September 12, 2022, Plaintiffs, Eric C. Berger and Mona H. Berger, filed the Petition for Damages (the "Petition") against National Union, Lexington Specialty Insurance Agency, Inc., and AIG Property Casualty Insurance Agency, Inc. According to the Petition, on September 15, 2020,

---

[1] Plaintiffs do not oppose the credit of $211,664.87 in the Motion for Partial Summary Judgment. *See* R. Doc. 51, p. 1.

1

Plaintiff Eric Berger was driving a 2019 Ford F-150 pick-up truck owned by his employer, EnLink Midstream Operating ("EnLink"), when he was rear-ended by a 2007 Toyota Yaris owned by Deborah Champagne and operated by Joseph Champagne (the "Accident"). Plaintiffs settled with Joseph and Deborah Champagne for the $15,000 policy limits of the Champagnes' auto insurance. In the Petition, Plaintiffs allege they are entitled to UIM coverage under policies issued to Eric Berger's employer.

National Union issued a commercial auto policy to EnLink Midstream, LLC bearing Policy No. CA 726-99-30, effective May 1, 2020, to May 1, 2021 (the "National Union Policy"). The National Union Policy provided a liability limit of $3,000,000, but EnLink validly selected lower limits of $100,000 for UM/UIM coverage. Plaintiffs settled with National Union for the $100,000 limits of the UIM coverage, and in consequence National Union has been dismissed from this lawsuit.

Plaintiff Eric Berger also filed a workers' compensation claim in relation to his alleged injuries and damages from the Accident. As of June 1, 2023, the workers' compensation carrier has paid Mr. Berger a total of $196,664.87, consisting of $136,437.73 in medical expenses and $60,227.14 for lost wages.

Lexington has filed a motion for summary judgment seeking dismissal, with prejudice, of Plaintiffs' claims. Plaintiffs admit that their damages do not exceed $3,211,664.87. R. Doc. 50, p. 3. Thus, the legal question before the Court is whether Lexington's umbrella policy drops down to provide UIM coverage in the gap between National Union's $100,000 UIM coverage and the

remaining $3,000,000 limits of the National Union Policy.[2] Defendant maintains that Louisiana courts have consistently held that umbrella and excess insurance policies which include the same language as the Lexington Policy do not drop down in coverage. Plaintiffs counter that the lead Louisiana case relied on by Lexington, *Washam v. Chancellor*, 507 So.2d 806 (La. 1987), did not involve a signed written waiver of UM/UIM coverage in the umbrella policy, unlike the Lexington Policy; and (2) the Lexington Policy's Insuring Agreement is ambiguous and creates an alleged impossibility because the "Insured" cannot become legally obligated to pay damages in the context of statutorily mandated UM/UIM coverage. *See* R. Doc. 50. Defendant argues that (1) the existence of a UM/UIM rejection form is irrelevant to the sole issue on this Motion (i.e., whether the Policy drops down), and in any event, Plaintiffs' exact argument with respect to the rejection form has already been squarely rejected by the Court of Appeal in *Dupree v. Hill*, 530 So.2d 1226, 1229-30 (La. App. 2d Cir. 1988); and (2) the Lexington Policy is clear and unambiguous, and Plaintiffs' alleged "ambiguity" has no bearing on the only issue in this Motion—whether the Lexington Policy attaches at excess of $3,000,000 or excess of $100,000.

**LAW AND ANALYSIS**

Summary judgment is proper where "the movant shows that there is no genuine dispute as

---

[2] By "drop down" is meant "the minimum threshold of the excess insurance company's obligation is lowered in order to cover the gap in coverage resultant from the primary insurance company's insolvency." *Louisiana Insurance Guaranty Ass'n v. Interstate Fire & Casualty Co.*, 630 So.2d 759, n.1 (Citations omitted). Drop down coverage "occurs when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underlying level of coverage has agreed to provide." *Id.* (citations omitted).

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (citation and internal quotations removed). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016).

In *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583 (La. 2007), the Louisiana Supreme Court laid out the comprehensive framework for interpreting insurance policies under Louisiana law. The *Sims* Court explained, "[i]n analyzing insurance policies, certain elementary legal principles apply. First and foremost is the rule that an insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code." *Id.* at 588–89 (citations removed). According to the general rules of interpretation of contracts, the court must determine the parties' common intent. *Id.* at 589 (citations removed); *see also* La. Civ. Code art. 2045. Courts begin their analysis of the parties'

4

common intent by examining the words of the insurance contract itself. *See* La. Civ. Code art. 2046. In ascertaining the common intent, words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning. *See* La. Civ. Code art. 2047. When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written. *See* La. Civ. Code art. 2046.

Under Louisiana law, the insured bears the burden of establishing that a claim falls within the policy coverage. *See, e.g., Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 362 (5th Cir. 2010); *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000). If the insured carries this burden, the insurer then bears the burden of proving the applicability of an exclusionary clause within the policy. *Doerr*, 774 So. 2d at 124.

With those principles in mind, we turn to the policy at issue. The Lexington Policy states that it "will pay on behalf of the 'Insured' those sums in excess of the 'Retained Amount' that the 'Insured' becomes legally obligated to pay as damages because of 'bodily injury', 'property damage', or 'personal and advertising injury' to which this insurance applies." R. Doc. 45-10, p. 10. The Lexington Policy defines "Retained Amount" as:

> W. "Retained Amount" means:
>
> 1. The total applicable limits of "scheduled underlying insurance" (plus any "Self-Insured" retention applicable thereto) and any applicable "other insurance" providing coverage to the "Insured"; or
>
> 2. The "Self-Insured Retention" applicable to each "occurrence" that results in damages not covered by "scheduled underlying insurance" nor any applicable "other insurance" providing coverage to the "Insured".

"Scheduled underlying insurance" is defined as:

> X. "Scheduled underlying insurance" means:
>
> 1. The policy or policies of insurance and limits of insurance (plus any selfinsured retention applicable thereto) shown in the Schedule of Underlying Insurance; and
>
> 2. Automatically any renewal or replacement of any policy in Paragraph 1 above, provided that such renewal or replacement provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced.
>
> "Scheduled underlying insurance" does not include a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

The Policy identifies the Schedule of Underlying Insurance for Commercial Auto Liability as:

```
Commercial Auto Liability                       X Occurrence   Claims Made
Company:    National Union Fire Insurance Company of Pittsburgh, PA.
Policy Number: CA 7269930
Policy Period:  From: 05/01/20      To: 05/01/21
Minimum Applicable Limits:
    Each Occurrence:                    $ 3,000,000    CSL
    Self-Insured Retention (if applicable):   $ 1,000,000    Per Claim   Per Claimant X Per Occurrence
```

The Policy also contains a provision titled "Maintenance of Scheduled Underlying Insurance":

6

> J. **Maintenance of Scheduled Underlying Insurance**
>
> You agree that during the "policy period":
>
> 1. You will keep "scheduled underlying insurance" in full force and effect;
> 2. The terms, definitions, conditions and exclusions of "scheduled underlying insurance" will not materially change;
> 3. The total applicable limits of "scheduled underlying insurance" will not decrease, except for any reduction or exhaustion of aggregate limits by payment of damages to which this policy applies.
> 4. Any renewals or replacements of "scheduled underlying insurance" will provide equivalent coverage to and afford limits of insurance equal to or greater than the policy being renewed or replaced.
>
> If you fail to comply with these requirements, we will be liable only to the same extent that we would have, had you fully complied with these requirements.

The Policy also sets forth the "Limits of Insurance":

> F. This policy applies only in excess of the total applicable limits of "scheduled underlying insurance" and any applicable "other insurance" whether or not such limits are collectible. If, however, a policy shown in the Schedule of Underlying Insurance has a limit of insurance:
>
> 1. Greater than the amount shown in such schedule, this policy will apply in excess of such greater amount; or
> 2. Less than the amount shown in such schedule, this policy will apply in excess of the amount shown in the Schedule of Underlying Insurance forming a part of this policy.

Finally, the Policy contains an exclusion for workers' compensation benefits that the states the insurance does not apply to:

> D. **Workers' Compensation and Similar Laws**
> Any obligation of the "Insured" under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

Defendant is correct that Louisiana courts, as well as courts nationwide, have held as a general rule that umbrella and excess insurance policies which include the same language as in the Lexington Policy do not drop down in coverage. *See Louisiana Insurance Guaranty Ass'n v. Interstate Fire & Casualty Co.*, 630 So.2d 759, 769-70 (La. 1994) (citations omitted). The lead

case in Louisiana is *Washam v. Chancellor, supra*. In the *Washam* case, a truck driver was injured in a collision between two dump trucks and, consequently, sued his employer's underlying automobile liability insurer, USF & G. The limit of the USF & G automobile liability policy was $500,000, but the employer had elected, by written waiver, to carry only $10,000 in UM coverage. Twin City Fire Insurance Company had issued an umbrella policy that also provided coverage for the plaintiff's employer with limits of $5,000,000, with an underlying coverage threshold of $500,000 as listed in the Schedule of Underlying Insurance. After settling with USF & G for its $10,000 UM limit, Washam sued Twin City under the employer's umbrella policy. In the umbrella policy's Schedule of Underlying Insurance, the underlying policy was listed as "$500,000 combined single limit for bodily injury and/or property damage."

  The Supreme Court found that the threshold at which the umbrella policy would take effect was the combined single limit of $500,000 for automobile liability in the underlying policy, as stated in the Schedule of Underlying Insurance, rather than the $10,000 limit of UM coverage elected by the insured in the underlying policy. The court rejected the argument that the failure of the umbrella policy to specifically list the underlying limit for UM coverage had the effect of lowering the threshold of UM coverage in the umbrella policy. The court noted that the provisions of the umbrella policy required Twin City to indemnify the insured for ultimate net loss in excess of the underlying limit, which was defined as "the amount of applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies...." The Twin City policy required the named insured to maintain each policy described in the declarations section in

8

full effect during the term of the umbrella policy.

The *Washam* Court stated that the employer's reduction of the UM coverage limits in the underlying policy constituted a violation of that provision. The umbrella policy provided that failure to maintain the underlying insurance policies would not invalidate the Twin City policy. Instead, Twin City would only be liable to the extent it would have been liable had the underlying UM limit been maintained. Therefore, the court held that, inasmuch as Twin City's threshold coverage could not be lowered by the insured's failure to maintain its UM underlying insurance, Twin City would only be required to pay damages in excess of the $500,000 threshold under the UM coverage of its umbrella policy.

There are several other cases relevant to the issues in the instant case. In *Louisiana Insurance Guaranty Ass'n*, the question presented was whether an excess insurer must drop down into the position of an insolvent primary insurer. The Supreme Court, after thoroughly reviewing the policy and applicable law, concluded the subject policy was plain and unambiguous that the excess carrier would not provide primary coverage in the event of the underlying carrier's insolvency.

In *Tijernia v. Stawecki*, 670 So.2d 792, 794 (La. App. 1996), the issues were whether there was a valid rejection of the UM coverage and whether the excess carrier would drop down to provide UM coverage. The court found that the waiver was valid and, applying *Washam*, found that the excess policy did not drop down and, thus, would not provide UM coverage until there was an award in excess of the underlying policy.

9

In *Dupree v. Hill*, 530 So.2d 1226 (La. App. 1998), the Court was confronted with whether the UM coverage under the excess carrier's policy is available to the plaintiff before the uninsured motorist's liability reaches $500,000. There, the plaintiff sued the tortfeasor and her auto liability insurer, and brought a UM/UIM claim against the primary insurer First Horizon Insurance Company ("First Horizon") and the umbrella insurer Chicago Insurance Company ("Chicago"). The First Horizon policy had an auto liability limit of $500,000, but the insured had executed a selection of lower limits form selecting UM/UIM coverage of only $25,000. The Chicago umbrella policy had a liability limit of $1,000,000, and listed the First Horizon policy as underlying insurance with a combined single limit of $500,000. The plaintiff argued that the Chicago umbrella policy dropped down in UM/UIM coverage from excess of $500,000 to excess of only $25,000 because there was an invalid written signed waiver form in the Chicago umbrella policy.

The *Dupree* Court found that "[t]he waiver form signed by the plaintiff has no bearing upon the requirement of the Chicago umbrella policy that the underlying limits be exhausted before its coverage becomes applicable. To the contrary, the form concerns only the upper limits of the UM coverage available under the Chicago policy once the underlying limits requirement has been satisfied." *Id.* at 1229. The court reasoned:

> None of the options [on the UM form] permitted the plaintiff to alter the policy's requirement that the insured must maintain underlying primary coverage, nor did these options reduce the threshold at which UM coverage under the umbrella policy would take effect. The present situation here is no different from that presented in *Washam*, where the insured had not signed a written waiver or reduction of UM coverage with respect to the umbrella policy. Consequently, we find the waiver form to be totally irrelevant to the issue presently before the court.

10

*Id.* at 1229-30. The court concluded the umbrella policy did not drop down in coverage and would not provide coverage until the total damages reached an amount in excess of the underlying policy's full limits. *Id.* at 1231.

In the instant case, Plaintiffs assert that the UM rejection form in the Lexington Policy improperly completed by Enlink, the employer, was invalid and, thus, the Lexington Policy drops down to provide gap coverage. However, as Defendants point out, the existence or non-existence of UM coverage in the Lexington Policy is not at issue. Applying both *Washam* and *Dupree* to the facts of this case, the Court must conclude that the allegedly "invalid" waiver form in the umbrella policy does not affect when the Lexington Policy's excess UM coverage attaches. Further, the Lexington Policy required that the insured maintain underlying primary coverage. Accordingly, the Court finds no merit to Plaintiffs' argument that the invalid waiver changes the application of *Washam*.

Additionally, the Court finds the terms of the Policy to be both clear and unambiguous and does not attach until Plaintiffs prove damages in excess of the Retained Amount. Even if there were some ambiguity in whether the insured can become legally obligated to pay UM benefits as damages, Defendant is correct that there is no ambiguity in the definitions of Retained Amount, Scheduled Underlying Insurance, or the requirement for Maintenance of Scheduled Underlying Insurance. As the court in *Louisiana Insurance Guaranty Ass'n* reasoned, when interpreting the Lexington Policy as a whole, the Lexington Policy is clear and unambiguous that it applies only

in excess of the full $3,000,000 liability limits of the underlying National Union Policy.

**CONCLUSION**

Accordingly,

**IT IS ORDERED** that Motion for Summary Judgment (R. Doc. 45) and the Motion for Partial Summary Judgment (R. Doc. 48) are hereby GRANTED and Plaintiffs' claims are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 30th day of September 2024.

GREG GERARD GUIDRY
UNITED STATES DISTRICT JUDGE